26688. NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY *v.* FALKS.

DECIDED FEBRUARY 24, 1938.

*Hendrix & Buchanan,* for plaintiff in error.

*Irving S. Nathan, Haas, Gambrell & Gardner,* contra.

SUTTON, J. Mrs. Alice Falks, as beneficiary, brought suit against National Life & Accident Insurance Company on a contract of life insurance issued on July 7, 1936, to her mother, Mrs. Annie L. Combs, in the principal sum of $250. The company defended on the ground that the insured made false and fraudulent representations as to being in good health and fraudulently concealed material facts as to illness. It was set up that in answer to the question, "Are you in good health?" the insured answered "Yes," and that in response to the question, "What illness, injury or accident have you ever had?" the applicant answered "Pneumonia twenty-five years ago, fully recovered," whereas for six months before the making of the application for insurance she had suffered from pellagra, which had manifested itself for practically two years, the disease being manifested by a type of dysentery, and that she had also suffered from a serious swelling of her hands, the skin being ruptured and a watery substance issuing therefrom, for many months prior to the date of the written application. The answer also set up that the insured had consulted in June, 1936, a Dr. Hackney, a physician for the City of Atlanta, in an effort to have her trouble diagnosed; that he had prescribed for her; and that such facts had been concealed from the defendant. The jury returned a verdict in favor of the plaintiff. The defendant filed a motion for new trial on the general grounds, and the exception here is to the judgment overruling the motion.

The application for insurance was not attached to the policy or made a part of the contract, and, consequently, representations or concealments, although false and material to the risk, would not defeat recovery unless the conduct of the insured was fraudulent. The only pertinent inquiry now before this court is whether or not, under any part of the evidence, the jury was authorized to find that the insured acted in good faith and not fraudulently. It ap-

pears from the evidence that the insured, a woman of 58 years of age at the time she made the application, had, according to the testimony of a physician, been afflicted with pellagra for more than a year. This condition, however, was not known to her or any one else, and this physician who attended her in the illness which resulted in her death on January 7, 1937, stated that in his opinion such a disease might not be detected by a layman. That the insured fraudulently misrepresented her condition in that respect must, therefore, be eliminated from the consideration of whether or not she knew she was in good health. But it is contended by the defendant that for more than a year she had also suffered from a looseness of bowels, with occasional discharge of mucous or blood, and that her hands were swollen and the skin cracked, with a watery fluid issuing therefrom, and that by the concealment of such facts a finding is demanded, as a matter of law, that her act was fraudulent. It is undisputed that for more than eight years, with the exception of a visit to Dr. Hackney, a city physician of Atlanta, the insured had not been attended by any physician. During the time she was afflicted as set out above, members of her family urged her to seek medical advice, but she protested that it was unnecessary, did not wish to be embarrassed with questions, that there was nothing the matter with her but "the itch," although there was testimony that at times the condition of her hands was such as to prevent her from doing ordinary household duties and that she was often sleepless and interfered with the sleep of others in the same house with her. It is not shown that her visit to Dr. Hackney was for any purpose except to have her hands treated. He prescribed salve, which she used, and at the time of the application healing had taken place. Theretofore, the condition or manifestation had been intermittent.

As to the looseness of bowels with occasional discharge of mucous or blood, it was shown that such condition was also intermittent, its recurrence being brought about from time to time by consumption of rough foods. By proper dieting she was able to bring about temporary relief. As to her ability to perform household duties, there was testimony that at times she was incapacitated; but there was also testimony that generally she could perform the usual household duties for one of her years, and that a few weeks before making the application, and while visiting a daughter in

Newnan, Georgia, she cooked, milked, and kept house for seven or eight persons. The physician, who attended her in the illness leading to her death, had made many professional visits to members of her family, she being present at the time, but to him she never indicated that anything serious was troubling her. Although several members of her family advised her to consent to treatment or be placed in a hospital, it is clear that she never regarded her bowel condition seriously, never worried about it or complained except to refer to it as uncomfortable. It appears that she was at times morbid, but this state of mind seems to have been brought about by a realization that she had no regular home of her own and was forced to accept the hospitality of the several members of her adult family.

The agent who took her application for insurance testified that she appeared to be normal, free and willing to answer any questions without hesitation, and that he based his opinion that she was apparently in good health "on the fact that she was up and walking and apparently in good health." A friend of the family testified that a month or two before the application was made she visited his office in connection with a business matter and appeared to be in normal health and spry.

Notwithstanding that there was some conflict in the evidence, was that which is set out above sufficient to authorize the jury to find that the insured did not act fraudulently in answering "Yes" to the question, "Are you in good health?" and, in response to the question, "What illness, injury or accident have you ever had?," answering "Pneumonia, twenty-five years ago, fully recovered?" "The term 'sound health,' as used in a life-insurance policy which provides that there shall be no liability under the policy if the insured is not in sound health at the date of the issuance of the policy, is properly defined in the charge of the court as follows: 'If the insured enjoyed such health and strength as to justify the reasonable belief that she is free from derangement of organic functions, or free from symptoms calculated to cause reasonable apprehension of such derangement, and to ordinary observation and to outward appearance her health is reasonably such that she may with ordinary safety be insured and upon ordinary terms, the requirement of good health is satisfied. . . The terms 'sound health' or 'good health,' used in a policy, mean that the applicant

has no grave impairment or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system.' Under this definition 'sound health' consists not alone in the outward appearance of sound health, but also in a reasonable freedom from physical derangement and impairment as above defined. See, in this connection, Joyce on Insurance (2d ed.), § 2004, *Atlantic & Birmingham R. Co.* v. *Douglas*, 119 *Ga.* 658 (46 S. E. 867)." *National Life & Accident Insurance Co.* v. *Smith*, 34 *Ga. App.* 242 (1) (129 S. E. 113). In Northwestern Mut. Life Ins. Co. v. Wiggins, 15 F. (2d) 646, 648, it was said: "'Good health,' 'illness,' and 'disease' must be considered, in an application for insurance, not in the light of scientific technical definitions, but in the light of the insured's understanding in connection with which the terms are employed in the examination." In that case the insured knew that he had "chronic" anemia, that is, that it had continued for some time. The record showed that he knew he had impoverishment or thinness of the blood, which he attributed to loss of blood from the cavities of extracted teeth about four years before he made application for insurance. To the questions as to whether he had had any illness, disease or accident during the preceding ten years and whether since childhood he had had any chronic or constitutional disease he answered in the negative. Recovery was upheld, notwithstanding that the insured in fact suffered from myelogenous leukemia, a fatal disease, which ultimately caused his death. See also Pacific Mut. Life Ins. Co. v. Cunningham, 54 F. (2d) 927, where a cancerous condition of the vocal cords was manifested, at the time of the application for insurance, by "fullness of the throat" and tonsil trouble, and where the insurer attempted to cancel the policy on the ground that the applicant had fraudulently represented that he had had no illness during the previous seven years. In Fidelity Mut. Life Ass'n v. McDaniel, 57 N. E. 645, 648, it was said: "'Illness,' as used, means a disease or ailment of such a severe character as to affect the general soundness and healthfulness of the system seriously, and not a mere temporary indisposition, which does not tend to undermine and weaken the constitution of the insured."

Must it be said, as a matter of law, that the insured knew that she had a *grave impairment* or *serious disease* and was not free from ailments that seriously affected the general soundness and

healthfulness of her system, and that in answering the questions in the application she acted fraudulently in the respects contended by the plaintiff in error? We think not. "Fraud may not be presumed, but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence." Code, § 37-706. Yet to sustain a charge of fraud as to answers made in an application for insurance the proof must be clear, cogent, convincing, and certain. Atlantic Co. v. James, 94 U. S. 207, 24 L. ed. 112; Guaranty Life Ins. Co. v. Frumson (Mo. Sup.) 236 S. W. 310; Northwestern Mut. Life Ins. Co. v. Wiggins, supra. Under the evidence the jury was authorized to find that the insured in the present case did not know that she was suffering from pellagra, the disease which caused her death, and that its manifestations, if such, loose bowels with discharge of blood, together with swollen hands and eruption with issue of watery fluid, did not necessarily suggest to her that she was not in "good health" within the meaning of the law and that she was afflicted with "illness" which amounted to a *grave impairment* or *serious disease*. This case is controlled in principle by *National Life &c. Ins. Co.* v. *McKenney*, 52 *Ga. App.* 466 (183 S. E. 659) and *National Life &c. Ins. Co.* v. *Williams*, 53 *Ga. App.* 677 (187 S. E. 145).

It is urged by the plaintiff in error that there was evidence showing that the insured realized the seriousness of her condition by expressing the opinion that she knew she was going to die and did not want to live. But a close examination of the evidence will disclose that the jury may well have concluded that such dejection on her part did not appear until after the death of her daughter in Newnan, Georgia, in August, 1936, subsequent to the application for insurance, and that her low spirits and hopelessness were occasioned rather by the sad event of her daughter's death.

All the cases cited by the plaintiff in error have been carefully considered, but none requires a ruling contrary to the one here made.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*