29506. PROGRESSIVE LIFE INSURANCE CO. *v.* GAZAWAY.

DECIDED MAY 8, 1942.

*Craighead, Dwyer & Lavender, Hardin. & McCamy,* for plaintiff in error.

*R. Carter Pittman, L. W. Honeycutt,* contra.

SUTTON, J. Bernard Gazaway, as beneficiary, brought suit against Progressive Life Insurance Company on a policy of insurance issued on September 16, 1940, to his wife, Cora Gazaway,

in the principal sum of $279. The company defended on the ground that the insured made false and fraudulent representations and concealments, in that in the application, which was not attached to and made a part of the policy, to the question "Are you now in good health?" she answered "Yes;" to the question "Have you lost a limb or an eye or have you any physical infirmity?" she answered "No;" and to the question "What illness have you had in the last five years?" she answered "Date, 1935, disease, asthma. O. K. now;" whereas at the time she applied for the insurance and the policy was issued, and for a number of years previously, the insured was suffering with rheumatic heart disease which was known to her and which brought about her death on March 1, 1941.

The company admitted that all due premiums had been paid and that proof of death had been filed and that it had refused to make payment under the policy. The jury returned a verdict in favor of the plaintiff, and the exception here is to the judgment overruling the defendant's motion for new trial based on the usual general grounds only. The application not having been attached to the policy, the representations or concealments, although false and material to the risk, would not defeat recovery unless the conduct of the insured was fraudulent. Consequently, the only inquiry before this court is whether or not under any part of the evidence the jury was authorized to find that the insured acted in good faith and not fraudulently.

Dr. D. L. Wood testified: "As to what her condition [the insured's] was in 1932 when I first saw her—well, . . she did have a rheumatic heart disease. . . In the course of two, three, or four years I probably saw her between ten and twenty-five times. . . I told her that she had a heart that would not let her do hard work, that she had to live a very quiet life, and that she had a type of heart trouble that she would never get over, but could live with it for a good long time, provided she took care of herself. Yes, on one occasion I was called to her home to see her, while she was pregnant with a child. As to what her condition was at that time, well, the heart action was worse because of the strain of pregnancy. . . On each occasion when I visited her and she was at my office I examined her heart. As to whether or not that condition remained the same during the time that I saw her, well, the basic condition was the same. She would get better

and get worse. Under treatment she would get better, get where she could go on with her ordinary activities. That rheumatic disease never grows better. Yes, it is a serious heart disease. As to whether that is such a disease as would affect a person's sound health—yes, it would if it is severe enough. There is different degrees of severity. There is a kind of moderate severity, that overexercise or overexhaust themselves, I should say. As to whether or not I would say this was a severe case—well, this was a moderate severe case, I thought. Yes, a few weeks prior to her death in 1941 I was called to treat her again. At that time she had influenza and a beginning of pneumonia. Yes, I treated her for influenza and pneumonia. I also examined her heart on that occasion, and she still had that rheumatic heart disease. As to whether or not it was worse when I saw her in 1932—well, at the time I saw her in January, 1941, she was beginning to have heart failure from the toxic effects of the flu and beginning of pneumonia. She was given digitalis in full doses and recovered from the flu and pneumonia, and the heart quieted down and was much better. I made three or four trips. I have forgotten now, and the last trip she was much improved, the heart had quieted down and was getting back right. . . I didn't attend her in the last days. . . If this lady had rheumatic heart disease when I first saw her in 1932, and during the next three or four years in which I saw her, and she had the disease when I was called to treat her in 1941, I would say that she was affected with that disease on September 4, 1940. As to whether or not laymen, and particularly working men don't usually recognize the specific disease that they have—well, many times they don't. Assuming that I treated Cora about eight years before 1940, which would have been about 1932, and that thereafter she apparently became well, that is, it appeared to her that she was, that she continued to work in the cotton mill as a textile worker for a number of years, as to whether or not I would say she would necessarily know that she had a specific disease—well, in this particular instance, with no reflection on Cora, Cora was a happy-go-lucky sort that didn't in fact, I don't think, ever realize the full seriousness of her condition, while I tried to explain it to her, but whether it made enough impression on her for her to remember I don't know, and I sometimes wonder if she did fully understand. . . If she was up and going

around, as to whether or not she would be able to carry on her normal activities without having shortness of breath or any other symptom that this type of heart disease would bring on—well, that type of heart disease often causes a shortness of breath. The word that laymen use for anything that causes shortness of breath —well, they usually say shortness of breath. They don't usually say asthma or shortness of breath. Now, there is in some cases some types of heart failure where the heart is permitted to fail rather suddenly, and that backs up the blood in the lungs, and the older practitioners call that cardiac asthma. . . A person with asthma can't breathe normally. That is a shortness of breath, but he doesn't breathe rapidly like a person does who has a shortness of breath from heart failure. They are panting for breath. . . When I treated her for this heart disease, as to whether or not that was more than five years before September 16, 1940,— to the best of my recollection I hadn't seen Cora for some four, five or six years; I don't know exactly. . . I didn't attend her at the time of her death. I didn't see her after the pneumonia in January, 1941. . . I recall going to her house and not recognizing her until I examined her heart in January, the first visit I made to the house. The room was a little dark. The minute I put my stethoscope to the heart I says 'I have heard this heart before.' I didn't know who it was until she raised up and says 'I guess so; it is Cora.' I recognized the heart ailment before I did her. That was in January of this year. I didn't know what her condition was before she got sick with flu and pneumonia in January, or for a period of several years, because I didn't see her."

Dr. Fred Ragland testified that he attended the insured at the time of her death, and that the cause of her death was bacteria endocarditis, bacteria affecting the valves of the heart, and that such disease usually accompanies rheumatic heart disease; that "I don't know whether she had that on September 16, 1940, or not, nor do I know that she had that when she made an application to the insurance company for a policy on September 4, 1940. This disease from which she died could have developed since September, 1940. Yes, it is true that pulmonary trouble is ofttimes associated with heart trouble, and it is also true that a heart ailment causes shortness of breath that a lay person might call asthma. Asthma may be a symptom of a heart trouble, and asthma may

not be a symptom of a heart disease. A person may have a heart disease with or without asthma. . . As to whether or not asthma rather frequently indicates something on down the road somewhere else—well, it depends on what kind of asthma it is, but in order to determine the particular type it is very often necessary to examine the heart."

Bernard Gazaway testified that Cora Gazaway was his wife and that they had been married a little over five years. That "Cora had never had any heart ailment either before or after we were married. until the time of her death that I know anything about. As to what was the condition of her health in the fall of 1940, five or six months before she died—well, she had been working, going along all right, worked at the spread house part of the time. I don't remember what spread house she was working at in September, 1940. She worked at Wintuff a while in the fall of 1940. As to whether or not she was regularly employed in the spread house during the fall of 1940—yes, sir. I don't know exactly how long she worked. . . Cora had the average health while we were. married, and able-bodied. Only thing, she would have a cold or flu, sometimes take cold. This is the only illness she had after we were married until she died, and pneumonia fever. As to how long before her death it was that she had pneumonia—I don't remember, just a few weeks before she died. When she would have a cold or the flu, as to how she would suffer—well, seemed like she couldn't get her breath good. As to whether or not she suffered. from asthma—well, she couldn't get her breath very well. I don't know how that works on you. I have never had it myself. She would have shortness of breath. . . She didn't have those spells very often. . . I don't think she was under weight. . . She had two legs when this policy was written, but she had to have one amputated and some days after that she died."

It appears from the testimony of Dr. D. L. Wood that the insured was afflicted with rheumatic heart disease in 1932 and for three or four years thereafter; that there are different degrees of severity of this disease and that the type the insured had was a moderately severe case, and that he told her that she "had a heart that would not let her do hard work, that she had to live a very quiet life, and that she had a type of heart trouble that she would

never get over, but could live with it for a good long time, provided she took care of herself;" but he further testified that, as to whether she necessarily knew that she had a specific disease, "Cora was a happy-go-lucky sort that didn't in fact, I don't think, ever realize the full seriousness of her condition, while I tried to explain it to her, but whether it made enough impression on her for her to remember I don't know, and I sometimes wonder if she did fully understand." He first treated her in 1932, and saw her for three or four years thereafter, but when he was called in to see her a few weeks before her death on March 1, 1941, he had not seen her for several years. In the meantime it does not appear that it was necessary for her to have any treatment for her condition. Dr. Fred Ragland testified that he attended her at the time of her death, and that the cause of her death was bacteria endocarditis, bacteria affecting the valves of the heart, and that such disease usually accompanies rheumatic heart disease; that "I don't know whether she had that on September 16, 1940, or not, nor do I know that she had that when she made an application to the insurance company for a policy on September 4, 1940. This disease from which she died could have developed since September, 1940." The insured married, and though her husband testified that during their married life of about five years she sometimes suffered from shortness of breath when she had a cold or flu, she was an able-bodied person, in average health, and able to work, and was regularly employed in the fall of 1940.

"The term 'sound health,' as used in a life-insurance policy which provides that there shall be no liability under the policy if the insured is not in sound health at the date of the issuance of the policy, is properly defined in the charge of the court as follows: 'If the insured enjoyed such health and strength as to justify the reasonable belief that she is free from derangement of organic functions, or free from symptoms calculated to cause reasonable apprehension of such derangement, and to ordinary observation and to outward appearance her health is reasonably such that she may with ordinary safety be insured and upon ordinary terms, the requirement of good health is satisfied. . . The terms "sound health" or "good health," used in a policy, mean that the applicant has no grave impairment or serious disease, and is free from any ailment that seriously affects the general soundness and

healthfulness of the system.' Under this definition 'sound health' consists not alone in the outward appearance of sound health, but also in a reasonable freedom from physical derangement and impairment as above defined. See, in this connection, Joyce on Insurance (2d ed.), § 2004, *Atlantic & Birmingham R. Co.* v. *Douglas,* 119 *Ga.* 658 (46 S. E. 867)." *National Life & Accident Insurance Co.* v. *Smith,* 34 *Ga. App.* 242 (129 S. E. 113). In Northwestern Mutual Life Insurance Co. v. Wiggins, 15 Fed. 2d, 646, 648, it was said: " 'Good health,' 'illness,' and 'disease' must be considered, in an application for insurance, not in the light of scientific technical definitions, but in the light of the insured's understanding in connection with which the terms are employed in the examination." It appears that the agent who took the insured's application wrote on the back thereof "Good risk," and under the facts of the case it can not be said as a matter of law that the jury was not authorized to find that the insured acted in good faith and not fraudulently in representing that she was in "good health" in September, 1940, when her application was taken, or that she had no "physical infirmity" or that the only "illness" she had had in five years was asthma in 1935. The case is controlled by *National Life &c. Co.* v. *McKenney,* 52 *Ga. App.* 466 (183 S. E. 659); *National Life & Accident Insurance Co.* v. *Williams,* 53 *Ga. App.* 677 (187 S. E. 145); *National Life & Accident Insurance Co.* v. *Falks,* 57 *Ga. App.* 384 (195 S. E. 463); *National Life & Accident Insurance Co.* v. *Bonner,* 58 *Ga. App.* 876 (200 S. E. 319); *Bankers Health & Life Insurance Co.* v. *Griffeth,* 59 *Ga. App.* 740 (1 S. E. 2d, 771). The court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Felton, J., concur.*