## 30132. NATIONAL LIFE & ACCIDENT INSURANCE COMPANY *v.* DORSEY.

DECIDED JUNE 30, 1943. REHEARING DENIED JULY 27, 1943.

*William F. Buchanan, Mary J. Payne,* for plaintiff in error.
*F. Lee Evans, Dillon & Rose,* contra.

SUTTON, J. Lillie Mae Dorsey brought suit in the civil court of Fulton County against National Life & Accident Insurance Company on a policy of insurance which she had taken out on the life of her son, Lester Sims. The company defended on the ground that the insured made false and fraudulent representations as to his health, and fraudulently concealed material facts as to illness, it being alleged that, in the application for the insurance, the insured represented that he had suffered no illness except infantile paralysis when five years old, and that, while it was true that he had suffered from infantile paralysis, as represented, he wilfully concealed from the company that for several years prior to his application for the insurance he had also suffered from epileptic fits, and that this fact was material to the risk and its concealment was a fraud upon the company, by reason of which the insured fraudulently obtained the issuance of the policy. It was further contended that under the following clause in the policy: "No obligation is assumed by the Company prior to the date hereof. Except as elsewhere herein provided, if the Insured is not alive or is not in sound health on the date hereof . . in any such case, the Company's full liability shall be discharged by the payment of the sum of the premiums received hereunder;" the company's full liability was limited to a return of the premiums paid by the insured. There was a verdict for the plaintiff. The judg-

ment overruling the defendant's motion for new trial was, on appeal, affirmed by the appellate division of the civil court, and the defendant excepted.

1. The application was not attached to the policy nor made a part of the contract, and therefore representations or concealments, although false and material to the risk, would not defeat recovery unless fraudulently made to obtain the insurance, the rule in such cases being that where the insured has made false and fraudulent statements as to matters that are material to the risk, or fraudulently concealed such matters from the insurer, for the purpose of obtaining the insurance, and has thereby induced the insurer to issue the policy, the policy is void, not as a matter of contract, but because it has been procured by fraud. *Johnson* v. *American Life Insurance Co.,* 134 *Ga.* 800 (68 S. E. 731). Since the passage of the Act of August 17, 1906 (Ga. L. 1906, p. 107), Code § 56-904, unless a correct copy of the application is attached to the policy, or contained therein, the application does not become a part of the policy or contract between the parties, and § 56-820 of the Code of 1933, in so far as it provides that representations in an application for insurance are considered as covenanted to be true, is modified by the act of 1906. In § 56-822 it is provided that, "A failure to state a material fact, if not done fraudulently, shall not· void the contract; but the wilful concealment of such a fact, which would enhance the risk, shall void the policy." It is insisted by the plaintiff in error that the evidence demanded a finding that at and prior to the time the application for the insurance was made, the insured was afflicted with epilepsy, that that fact was wilfully concealed from the company, and that its concealment materially increased the company's risk.

It appears from the evidence that the plaintiff, who was the mother of the insured and the beneficiary under the policy, applied for the insurance. The insured was not present when the application was prepared. The questions were propounded to the mother by the company's agent and her answers written down by him. The following questions and answers seem to be pertinent to the questions raised by the defendant: "21. Are you in good health? Yes. 22. Who is your Doctor? Dr. Allgood. 23. What illness, injury or accident have you ever had? Give details (over). 25. Have you ever had heart disease, asthma, tuberculosis, cancer, ul-

cers, diabetes, fits, kidney disease, syphilis, paralysis, rheumatism, sciatica, vertigo, etc.? No." 'The insured's name was signed by his mother. On the back of the application appeared the following notation: "Remarks: Infantile paralysis at 5 years old. Arm is stiff in the joint. He is in good health. I have known him 18 months and think he is a good risk." This statement was signed by the agent who took the application, with the further notation following his signature: "If you want any further inspection send it back." The application was dated January 29, 1942. The policy was issued February 9, 1942. The insured died April 23, 1942.

Lillie Mae Dorsey testified that Lester Sims was her son by a former marriage. At the time the application was taken she was living on Sams Street in Decatur. Lester was at his grandmother's in Avondale. Minnie Sims was his grandmother. His father was John Sims. Lester's health was good. There was nothing the matter with him except infantile paralysis. His right arm was withered. "I told Mr. Chandler all about that. He saw the boy every week-end. Since he was five years old he hadn't been sick at all. He had never had any fits. I didn't tell Minnie Sims he had spells. He never did fall down and scratch the floor. That's the reason I couldn't understand how he got down there and had fits. He never had none at home, and I don't believe he had them down there. When I made this application I didn't tell Mr. Chandler the boy was subject to fits. The boy didn't have fits. I just told Mr. Chandler how my boy was. He said: 'I know that boy; that boy aint sick.' He said, 'nothing the matter with that boy,' so he wrote his application. My boy didn't have no fits. When I signed the application, I told him my boy would be sixteen in May. He was born in 1926. I didn't make a mistake in telling his age, I made a mistake in my own age. I didn't tell him my boy was thirteen."

G. F. Chandler, a witness for the defendant, testified that he had known Lester Sims for more than a year, and knew his father, John Sims, his grandmother, Minnie Sims, and his mother, Lillie Mae Dorsey. Lester had been living down at Minnie Sims' house over a year. He went there every two weeks, and saw Lester regularly about twice a month. His health apparently was good. Looked well and healthy. Had a paralyzed arm. "I took the ap-

plication at Lillie Mae Dorsey's house. Lester was not present. I asked Lillie Mae all the questions, and put down the answers just as she gave them to me. I asked her about fits. She told me he had infantile paralysis when he was about five and hadn't been sick since. After I wrote the application, I went down to Minnie Sims's, where Lester was. I went by to see him again and be sure he was all right. Minnie Sims lives about a block from Dr. Allgood's house. I have known Dr. Allgood about three years. I didn't go to see Dr. Allgood. The reason I went to Minnie Sims's was to OK Lester and be sure he was there and in good health. I found him down there. I put on the application: 'If you want further inspection send it back.' They didn't send it back to me. The company issued the policy and I started collecting the premiums."

Dr. Allgood, also a witness for the defendant, testified that Minnie Sims lived about 560 feet from his home and worked for his wife, and that he had been seeing Lester Sims around there for four or five years. He was called down to Minnie Sims's to see him the day he died. They told him Lester had fallen in the branch. He found him wet all over, vomiting and frothing at the mouth, and unconscious. He was in an epileptic convulsion. It is recognized as a serious condition. Very few persons afflicted with epilepsy ever die under an epileptic convulsion, but it is liable to cause a brain hemorrhage, or heart exertion, from the convulsion. "I think the epilepsy was primarily the cause of his death. In my opinion he was not in sound health during a period of six months prior to his death. I never gave him a physical examination. As to what caused his death, I couldn't say, except that he had epilepsy, and that was the primary cause. What exactly caused it, I couldn't tell you. As to what I mean by the primary cause, he had a convulsion, which could have caused an extra heart exertion, or hemorrhage of the brain. Either one of those would have caused it. I was called about 12:30 p. m., and saw him about 2 p. m. He is supposed to have died about three or four that afternoon. I stayed about five minutes. I didn't give him a hypodermic or anything at all. They said he fell in the branch. He was wet all over. Some of his clothing was wringing wet. I told them to put dry clothes on him, and keep him on his side so the froth would work out of his mouth and nose both. He was breathing all right. He had some congestion in his lungs which

I thought was passive and caused by the convulsion. I don't think it was water. If he was in the branch the water would go into his lungs. I don't know how long he was in the water. It was an hour and a half after he fell in the branch before I got there. I never actually examined this boy at any time except his lungs and heart. I listened to them at the time he fell, down there at the car line. As to his general health, according to what you call general health, he had a paralyzed hand. He had this paralysis. He was a nervous kid. I never did say where his trouble was. I have known of him having a spell three times. He had an epileptic fit in January, 1940. I saw him have a spell on another occasion down at the car stop, about six or eight months before his death. On that occasion he just fell down. After he got through having the convulsion, he got up and went on. And then the spell he had when he died. Those nervous spells or convulsions could have been caused by the paralysis."

John Sims and Minnie Sims occupied the same house. Usher Freemen, a nephew of John Sims, lived with them. All three testified for the defendant and testified that Lester had had fits on numerous occasions during the greater part of his life. Minnie Sims also testified that Lester had eaten "a whole lot of apples" the day he died, and that "every time he ate apples, or any kind of sweets, he would have a spell."

We have not undertaken to set out all of the evidence, and although conflicting, the foregoing is sufficient, in our opinion, to show that the answers given by the mother were made in good faith, and if the insured was afflicted with epilepsy she did not know it. Moreover it appears that the agent who took the application was acquainted with the insured, and for more than a year preceding his death had seen him as often, if not oftener than had his mother, and that during that time had frequently been in the home where the boy lived, collected premiums on policies carried by members of the family, was well acquainted with the entire household and in position to get first-hand knowledge of the health of all of them, and based on knowledge acquired in that manner, gave it as his opinion, both in an endorsement on the application and in his testimony on the trial, that the applicant was in good health, and was a good risk. The jury was authorized to find that there was no wilful concealment or fraudulent intent by the plain-

tiff. *National Life & Accident Insurance Co.* v. *Martin,* 35 *Ga. App.* 1 (1) (132 S. E. 120); *National Life & Accident Insurance Co.* v. *Lee,* 46 *Ga. App.* 4 (166 S. E. 253); *National Life & Accident Insurance Co.* v. *McKenney,* 52 *Ga. App.* 466 (183 S. E. 659); *National Life & Accident Insurance Co.* v. *Williams,* 53 *Ga. App.* 677 (187 S. E. 145); *National Life & Accident Insurance Co.* v. *Falks,* 57 *Ga. App.* 384 (195 S. E. 463); *National Life & Accident Insurance Co.* v. *Boyd,* 66 *Ga. App.* 722 (19 S. E. 2d, 210); *Progressive Life Insurance Co.* v. *Gazaway,* 67 *Ga. App.* 339 (20 S. E. 2d, 189).

The defendant also contends that the liability of the company was limited to a return of the premiums paid under the above quoted provision in the policy. The plaintiff testified that she told the agent who took the application for the policy in question that her son, Lester Sims, had infantile paralysis when he was five years old and that one of his arms was withered from paralysis. In answer to the question in the application "What illness—have you ever had?" the agent wrote on the application "Infantile paralysis at 5 years old. Arm is stiff in the joint. He is in good health. I have known him eighteen months and think he is a good risk. If you want any further inspection send it back." The agent testified that he had known Lester Sims about eighteen months and had seen him regularly every two weeks during that time, that he looked well and healthy, except he had a paralyzed arm and that he went to see him about fifteen minutes after he took the application for the policy sued on to see if he was all right and to be sure he was in good health, and that he saw him at that time; that he knew Dr. Allgood, who lived within a block of where Lester Sims was staying, but he did not ask the doctor about him. "Dr. Allgood" was the answer to the question in the application, "Who is your doctor?" Dr. Allgood testified, in part, that Lester Sims had a paralyzed arm and hand, that he never examined him except to listen at his heart and lungs when he fell at the car track about six months before his death, that he was a nervous kid, that "the book says the cause of those spells [referring to epileptic fits] is that the brain becomes thickened, the corpus callosum of the brain layers thicken—the nervous spells or convulsions could have been caused if he was ever paralyzed, it could have caused a quickening of the corpus callosis; very few persons

are afflicted with epileptic convulsions that have had paralysis around his face and arms—it is possible for that to happen." The uncontroverted evidence showed that the insured had had infantile paralysis and that he had a paralyzed arm when the application for the insurance was made and that the defendant knew this. The jury was authorized to find from the evidence of the plaintiff and the agent of the defendant who took the application that the insured was in sound health within the meaning of that term as used in the policy at the time it was issued, except for the paralyzed arm. *National Life & Accident Insurance Co.* v. *Martin,* 35 *Ga. App.* 1 (2) (132 S. E. 120); *National Life & Accident Insurance Co.* v. *Carter,* 46 *Ga. App.* 1 (166 S. E. 247). But if it could be said from the testimony of Dr. Allgood and other witnesses that the insured was not in sound health at the date of the issuance of the policy, as contended by the defendant, then it clearly appears that the defendant could have ascertained this from the information furnished it in the application and from the knowledge of its own agent who took the application by making inquiry of Dr. Allgood whose name was given in the application as the doctor, and of the parties with whom the boy was living at that time. Under the law and the facts, a finding was not demanded that the insured was not in sound health, within the meaning of the terms of the policy on the date of its issuance, but on the contrary, the verdict in favor of the plaintiff was authorized. *Rome Insurance Co.* v. *Thomas,* 11 *Ga. App.* 539 (75 S. E. 894); *National Life & Accident Insurance Co.* v. *Sneed,* 40 *Ga. App.* 131 (149 S. E. 68).

2. Error is assigned on the refusal of the court to give the following request in charge to the jury: "In general it can be said that the test, in determining whether questions contained in the application for insurance are material, is whether the knowledge or ignorance of the facts sought to be solicited thereby would materially influence the action of the insured." An examination of the charge discloses that the principle embodied in the foregoing request was covered in the general charge, and the court did not err in failing to charge in the language requested.

3. The defendant assigns the following excerpt from the charge as error on the ground that it was "not sound as an abstract principle of law, and placed a greater burden on the defendant than is required by law:" "Well then you must believe that the state-

ments made in the application were untrue and that they were known to be untrue by the applicant for the insurance policy, and then you must believe that the insurance company, the defendant here, relied on the statements and that they were made for the purpose of fraudulently inducing the insurance company to issue the policy." One of the defenses was that the insurance was procured by fraud. It was alleged that the insured wilfully concealed from the company material facts concerning his health for the purpose of inducing the issuance of the policy to him, and we see no merit in this ground of the motion for a new trial. *Torbert v. Cherokee Insurance Co.*, 141 *Ga.* 773 (82 S. E. 134) ; *National Life & Accident Insurance Co.* v. *McKenney*, supra.

4. The trial court did not err in overruling the motion for new trial, nor did the appellate division err in affirming the judgment of the trial court. *Judgment affirmed. Stephens, P. J., concurs.*

FELTON, J., dissenting. I am of the opinion that the uncontradicted evidence demands the finding that the insured was not in good health at the time of the issuance of the policy.